*In re* INTEREST OF THERESA STACEY *et al.*, MINORS—(THE PEOPLE OF THE STATE OF ILLINOIS, Petitioner-Appellee, *v.* DONALD STACEY *et al.*, Respondents-Appellants.

(No. 58051;

First District (1st Division)—December 3, 1973.

Paul Bradley, Deputy Defender, of Chicago (Martin Carlson, Assistant Appellate Defender, of counsel), for appellants.

Bernard Carey, State's Attorney, of Chicago (Sheldon Gardner and Michael Kreloff, Assistant State's Attorneys, of counsel), for the People.

Mr. PRESIDING JUSTICE BURKE delivered the opinion of the court:

This is an appeal from orders in the Circuit Court of Cook County, Juvenile Division, wherein the trial judge found that the three minor children of Donald and Matilda Stacey were neglected children and ordered that they be removed from the custody of their parents. The sole issue before this court is whether the finding of neglect was contrary to the manifest weight of the evidence.

On January 22, 1971, petitions were filed by the Cook County Department of Public Aid with respect to Theresa, Mary Eliza and Donald

Stacey, minors born June 1, 1967, September 6, 1968 and October 10, 1965, respectively. The petitions alleged that the children were "neglected as to proper or necessary support." An order for temporary custody of Donald, a retarded child, was entered on February 19, 1971. The record indicates that this order was vacated on August 27, 1971. The cases were consolidated and after many continuances, a hearing on the petitions was begun on August 15, 1972. On August 18, 1972, the judge entered the orders finding the children neglected and ordering their commitment to the custody of the Guardianship Administrator of the Illinois Department of Children and Family Services.

The State called four witnesses to support the allegations in the petitions. The first of these, Miss Rhoda Mishoulam, the family's Cook County Department of Public Aid caseworker, testified as to three visits she made to the Stacey home within an approximately eleven-day period in January 1971. Mrs. Stacey and the children were then living in a basement apartment, and Mr. Stacey was not living with them. On the first visit, at about 11:00 A.M., Mrs. Stacey was present and the children were sleeping. Miss Mishoulam testified she observed that the living room was neat, but there were bags of garbage in the dining room and kitchen and there were dirty diapers on the bathroom floor. She said that the garbage made it difficult to go through the dining room into the kitchen. She testified that the children's bedclothes were filthy and torn, and the children were very dirty, specifically in the creases of their arms and legs. She observed many items of unwashed and unmended clothing lying around the dining room and the children's bedroom. She also stated that Donald was wearing a T-shirt that had a big hole in it.

As to the physical condition of the apartment, Miss Mishoulam testified that the living room contained a couch, coffee table, two chairs, a television set and a stereo. The children's bedroom contained two single beds. The dining room contained a table and chairs, and the kitchen contained a table and cabinet. The master bedroom contained a double bed and two dressers. The bathroom contained some clothing and boxes. She further testified that the beds seemed to be in relatively good condition, the living room furniture appeared quite worn, but the television and stereo appeared new.

As to the second visit at about 2:00 P.M., approximately one week later, Miss Mishoulam testified that the children were sleeping and Mrs. Stacey was in the living room. She stated that the children were dressed in very shabby, dirty, food-stained underwear and their arms, legs and faces still looked dirty. Donald's undershirt had a hole in the back; the girls' sleeves were torn and very frayed. She observed clothing still stacked in the dining room and bedroom. She testified that none of the

garbage appeared to have been removed, although Mrs. Stacey had been warned to get rid of it as it might eventually attract rats and roaches. Miss Mishoulam testified on cross-examination that she discussed on this and the third visits the possibility of getting Mrs. Stacey a homemaker to come in and assist her in housekeeping and caring for the children on a temporary basis. Mrs. Stacey felt that she could handle her duties without such help.

On the occasion of the third visit, at about 1:00 P.M., four days later, Miss Mishoulam testified she observed Mrs. Stacey, the children and Mrs. Stacey's friend, Mr. Reed. Donald and Theresa were in bed, and Mary Eliza was up. The children were clothed in underwear, which appeared to the witness to be the same as that of the second visit. The children appeared to her very dirty, with their hair unwashed and their arms and legs filthy. The apartment was still filthy, with more garbage instead of less. The dishes were still piled in the sink, unwashed, and there was food turning moldy on the plates.

On cross-examination Miss Mishoulam testified that she made reports on her visits, and that the last time she looked at one of those reports was six months prior to the hearing. She stated that the girls appeared undernourished, which she later defined as extremely thin, very gaunt.

Miss Mishoulam also testified that the Stacey apartment was not cold. She never inquired of Mrs. Stacey whether she was receiving adequate financial assistance, although she discussed the Stacey public aid budget with Mrs. Stacey on the first and second visits. On redirect examination she testified that Mrs. Stacey's public aid in January 1971, was $225 per month, of which an estimated $110 was for rent. Finally, she testified that she requested the neglect petition be filed, as a result of her visits and an agency conference at Children's Memorial Hospital.

The second witness called by the State was Miss Diane Divine, a social worker for St. Vincent DePaul Center (formerly known as the DePaul Settlement House). She testified that in that capacity she first became acquainted with the Stacey children in January of 1970, when Mrs. Stacey applied for day-care for Theresa. Mrs. Stacey then had a part-time job. The center never cared for Donald, because it had no facilities for retarded children. In April of 1970 Mrs. Stacey applied for day-care for Mary Eliza. Miss Divine estimated she saw the children about three days of every full five-day week the girls attended. In January of 1970 she saw Theresa about ten times. Theresa appeared "not clean"; she wore no socks or leggings. Theresa was not dressed for winter weather, and she appeared unbathed, with dirt on her face, arms and legs. Theresa's clothes in that month were ill-fitting; a number of times her shoes were too small. Miss Divine testified that Theresa's appearance re-

mained the same through the balance of 1970, except that she noticed bruises on Theresa in the spring. During the fall of 1970, Theresa did not attend the center regularly. During the period from April of 1970 through January of 1971, Miss Divine noticed that Mary Eliza's appearance included sloppy dress, dirty dress, uncombed hair, shoes that did not fit properly, occasional wet pants since she was not entirely toilet-trained, and improper clothing for the weather. She also testified on cross-examination that she never talked to Mrs. Stacey about the children being improperly dressed or being dirty, and she did not know if anyone else at the center had. On redirect examination Miss Divine testified that there were about 20 children of the 200 in the center's care that appeared similar to the Stacey children.

On August 18, 1972, the State called Miss Nancy Gallagher, a clinical educator for the Children's Memorial Hospital, who testified extensively as to the children's hospital contacts. Since she had no personal knowledge of these contacts, however, her testimony was ordered stricken.

The next witness called by the State was Miss Rosalyn Muehl, director of social services at the Chicago School Work Shop for Retarded Children. She testified that Donald was enrolled in her school from September 1969, until the date of the first court hearing in January 1971. She testified that his attendance was irregular, that he would be absent an average of one or two times a week. Though the school required that an extra set of clothing be sent from the home in case the child got dirty, Mrs. Stacey never sent such a set. School funds were used to provide it, and it was never returned. Miss Muehl testified that Donald arrived at school in sub-zero weather at times wearing a very short pair of shorts, and that he arrived at school dirty. When Miss Muehl telephoned Mrs. Stacey, she was told that he got dirty on the bus, that he was clean when he got on it. This conversation was during the first school year. The witness was unable to pinpoint the occasions on which Donald was dirty, except to say it was during the school year. By dirty she meant unwashed, his hair dirty or wet. She stated that one other child of the 48 children in the school arrived dirty in the period September 1969 through June 1970.

The State rested its case and the respondents, Mr. and Mrs. Stacey, testified. At the time of the hearing, they were living together, with their children in Zion, Illinois.

Donald Stacey testified that he and his wife were not living together in January 1971, because they had had a fight and he had temporarily left home. In his absence, he testified that his family was on public aid. He visited the apartment on a number of occasions in January and found the children either clean or slightly dirty. The apartment, according to

his testimony, was either clean or slightly messed up on his visits. He stated that the stereo was a gift, and he had purchased the television for about $50. Neither was new.

Matilda Stacey testified that she recalled Miss Mishoulam's visits, which at times she said occurred when she was in the middle of cleaning the house. She denied that there were dirty clothes all over the house or that there were bags of garbage anywhere but in the kitchen. She testified that the children were not dirty, and that she bathed them daily.

■■ The statute under which the petitions were filed defines a neglected minor as one under 18 years of age:

"(a) who is neglected as to proper or necessary support, education as required by law, or as to medical or other remedial care recognized under State law or other care necessary for his well-being, or who is abandoned by his parents, guardian or custodian; or

(b) whose environment is injurious to his welfare or whose behavior is injurious to his own welfare or that of others." Ill. Rev. Stat. 1971, ch. 37, par. 702—4(1).

The law requires that a timely hearing be held after a neglect petition is filed. (Ill. Rev. Stat. 1971, ch. 37, par. 701—4 and 704—2.) We must determine whether that hearing reveals sufficient evidence to support the finding that the Stacey children were neglected as to proper or necessary support.

■■■ There is no fixed standard for a determination of neglect, so each case must be judged on its particular facts. (*People ex rel. Wallace v. Labrenz,* 411 Ill. 618, 104 N.E.2d 769.) An examination of the facts in this case forces the conclusion that the finding of neglect was contrary to the manifest weight of the evidence. Two factors seem to have contributed to the court's finding: dirt in the home and on the children, and improper and ill-fitting clothing. We approve the flexible standard of proof in neglect cases, since it accommodates radically different factual situations. But at best the testimony in this case indicates that the Stacey home and children, as well as the children's clothing, were dirty on three occasions in the space of eleven days, and that the children sometimes arrived at their respective day-care facilities dirty and without proper clothing.

This is not the clear-cut case of neglect that this court has previously faced. (See *In re Interest of Garmon,* 4 Ill.App.3d 391, 280 N.E.2d 19.) Mrs. Stacey was always home when the caseworker visited. She sent the children, albeit irregularly, to day-care facilities recommended to her. There is no evidence the children were suffering illness or abuse. The

claim that the girls were undernourished was based on their thin appearance, but the caseworker never inquired as to the sufficiency of their diet.

It should be noted that the incidents which served as the basis of the neglect finding occurred over one and a half years before the hearing on the petitions. While many factors may cause delays in reaching a final judicial determination, it is significant that the children, with the exception of Donald's temporary removal from the home, remained with their parents.

We consider it particularly important that a finding of neglect be supported as directed by statute by a preponderance of the evidence. While it can be said that a parent who is found neglectful may reform and petition for return of the child or children, in reality the parent is under a considerably greater burden in such a case. *The Custody Question and Child Neglect Rehearings,* 35 U.Chi.L.Rev. 478 (1967-8).

The judgment is against the manifest weight of the evidence and is therefore reversed.

Judgment reversed.

GOLDBERG and HALLETT, JJ., concur.