*In re* RAYMOND YBARRA, a Minor.—(THE PEOPLE OF THE STATE OF ILLINOIS, Petitioner-Appellee, *v.* JUANITA YBARRA, Respondent-Appellant.)

(No. 60247;

First District (1st Division)—June 2, 1975.

Roger B. Derstine, John D. Schullenberger, Joan D. Levin, and James M. DeZelar, all of Legal Assistance Foundation, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Sheldon Gardner, and Michael Kreloff, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE EGAN delivered the opinion of the court:

This is an appeal from an order of the Juvenile Division of the Circuit Court finding the respondent, Juanita Ybarra, an unfit mother and empowering the guardian of her son, Raymond Ybarra, to consent to his adoption. The respondent contends that the section of the Adoption Act upon which the proceedings were based is unconstitutional (Ill. Rev. Stat. 1973, ch. 4, § 9.1—1(D)(b)); that the court considered improper evidence by interviewing the child in private; and that the finding of unfitness is not supported by the evidence.

Raymond Ybarra was born on April 11, 1962. On May 29, 1962, he was decreed a dependent by the court and placed in St. Vincent's Orphanage. At that time the respondent was an in-patient at the Municipal Tuberculosis Sanitarium. From September 15, 1962, until April, 1965, Raymond was in a foster home. From April, 1965, until July, 1965, he lived at St. Joseph's Orphanage. In July of 1965, Raymond was placed in Angel Guardian Orphanage, where he remained until June 20, 1972, when he was placed in a foster home. His father died in April, 1969.

Raymond is one of eight children. The other children were taken from the respondent because her husband was ill and unable to work; in 1968, the two older boys were returned to her, and the five girls in 1972. In June, 1973, the petition for consent to adopt was filed and after a hearing the court made an oral finding of unfitness for two reasons: The respondent had failed to exhibit a reasonable degree of interest as to the child's welfare and had failed to make reasonable progress toward the return of

the child within 24 months after an adjudication of neglect. In the signed order the court made a finding of unfitness only on her failure to maintain a reasonable degree of interest as to the child's welfare.

■■ The statute Ill. Rev. Stat. 1973, ch. 4, § 9.1—1(D) provides in part:

> " 'Unfit person' means any person whom the court shall find to be unfit to have a child sought to be adopted, the grounds of such unfitness being any one of the following:
>
> * * *
>
> (b) Failure to maintain a reasonable degree of interest, concern or responsibility as to the child's welfare;
>
> * * *
>
> (l) Failure to make reasonable efforts to correct the conditions which were the basis for the removal of the child from his parents or to make reasonable progress toward the return of the child to his parents within twenty-four months after an adjudication of neglect under Section 2—4 of the Juvenile Court Act."

At this juncture we deem it appropriate to respond to several arguments of the petitioner that the order can be justified on the second ground given by the judge in his oral findings. Subsection (1) is inapplicable because there never was a finding of neglect under section 2—4 of the Juvenile Court Act (Ill. Rev. Stat. 1973, ch. 37, § 702—4). There was, instead, a finding under section 2—5 of the Juvenile Court Act (Ill. Rev. Stat. 1973, ch. 37, § 702—5) which refers, not to neglect, but to dependency.

Flora Lou Wright, who signed the petition, is a caseworker for the Child and Family Services of the Chicago Home for the Friendless. She first saw the respondent on May 26, 1972, at the respondent's home. She told the respondent that her agency felt that Raymond needed a home experience and that they had in mind a good foster home where he could remain until it was feasible for Raymond to return to the respondent's home. She testified that the respondent told her that she could not care for Raymond because of her great responsibilities for the children who were at home. She also testified that the respondent told her that if they placed Raymond in a foster home she would not visit him. Miss Wright told the respondent that all future visits with Raymond would have to be arranged through her agency. She made an appointment for June 1 at her office. The respondent appeared and told her she was still trying to get Raymond home, but that she was in ill health. She asked Miss Wright to take her to Angel Guardian Orphanage to see Raymond but was refused. Another meeting occurred on June 30 at Miss Wright's office and she explained to the respondent that Raymond had been placed in a foster

home. When Miss Wright was asked if she discussed the rules of visitation with the respondent she said:

"Not in detail, but that they would be in the office and it was her responsibility to keep in touch with me when she was ready to visit."

On August 14, the respondent called Miss Wright, who testified:

"Well, I gave her an appointment to discuss visiting and to arrange for a date, to go over the ground rules and Raymond's need of supervision during the visit; and she refused to come in to arrange for the visit saying that she was ill. I told her she should come to the office when she was feeling better so we could set up the visit."

An appointment was made for Miss Wright to go to the respondent's home but that meeting was cancelled because the respondent was going to visit her oldest son in prison. Another appointment was not kept by the respondent because she forgot. The respondent met Miss Wright at her office on February 6, 1973, and the respondent told her that she could not visit Raymond yet because of the many problems she had at home: Her housing was poor, gas and light bills were unpaid, she did not have sufficient income for food and clothing, her younger children had school problems and her older son was in prison.

They met again on February 23, and Miss Wright told her she was becoming concerned about the respondent's capacity as a parent, that she was going to "offer" the respondent another visit with Raymond and that, if the respondent did not follow through, she "would have to take action to protect Raymond's rights." The respondent replied with some acrimony, but a visit was arranged for March 20; the respondent did not appear. They did have a meeting on March 27. She told the respondent at that time that she should show more ability to come to the office to visit or they "would have no recourse but to follow up on adoption." She had told the respondent in an interview on March 5 that they were thinking of an adoption plan.

The respondent called in April, and a visit with Raymond was arranged for the respondent and two of her daughters for April 11 at Miss Wright's office. On that date Raymond saw his mother and sisters and said he did not want to visit her. Raymond met with his mother and sisters and the respondent told Miss Wright she did not like the way Raymond was behaving. Miss Wright did not hear from the respondent until August, over a month after Miss Wright filed a petition. In August, the respondent requested a visit with Raymond but was refused. It was Miss Wright's opinion that Raymond's best welfare would be served by the consent to adopt. She testified:

"I told Raymond that she [his mother] and I were talking about the possibility of visits but I wasn't sure that she in fact would be able to visit because, as he himself knew, she had failed many visits in the past."

The records of Angel Guardian Orphanage showed that the respondent visited Raymond 13 times in 1967; 3 times during 1968; 3 times in 1969; 12 times during 1970; and 3 times during 1971. The respondent testified that between June, 1971, and February, 1972, her five daughters were in St. Mary's boarding school and that she visited them once a month. During that time she was having difficulty with Virginia, who was running away from the school because, contrary to school rules, she wanted to come home every week to visit. Visits with Raymond included vacation periods and visits at home on Sundays and holidays. In February, 1973, she was ill with the flu for almost 3 weeks.

■■ After the respondent had completed her testimony the trial judge spoke to Raymond in his chambers alone. Later he summarized the boy's statements to him: Raymond visited his mother when his brothers and sisters were there and his recollection was that he was eight or nine years old; it was in the summertime. He did not recall visiting at Christmas time. He said that he feared his brothers Maurio and Jerry, who made him drink whiskey. When he first refused to do so, they put him outside at night while his mother was sleeping. He expressed a fear of returning. He said that he was happy in the foster home. When the judge "pressed him as to why he didn't want to return to his mother and how he felt about her" he told him that he didn't know how to say it and began crying. He expressed a considerable amount of fear. During his visit which was an extended one, his mother beat him with a strap but he did not say why. Afterwards, the trial judge indicated that he would rely on the testimony of Raymond in arriving at his decision. We are aware of the legislative declaration that in adoption proceedings the welfare of the child shall be the prime consideration; nonetheless, Raymond's testimony had no bearing on the question of fitness.

■■ Before a court may empower a guardian to consent to an adoption without the consent of the natural parent, there must be clear and convincing evidence of unfitness. (*In re Deerwester*, 131 Ill.App.2d 952, 955, 267 N.E.2d 505; *In re Adoption of Walpole*, 5 Ill.App.2d 362, 367, 125 N.E.2d 645.) In this case, there must be clear and convincing evidence that the respondent failed to maintain a reasonable degree of interest, concern or a responsibility as to Raymond's welfare. We judge that there is no such clear and convincing evidence.

A factually similar case was *In re Deerwester*, 131 Ill.App.2d 952, 267

N.E.2d 505. In that case the child and his brother and sister (twins) were transferred from their father and mother, who were divorced, pursuant to a consent dependency decree. All three children were physically handicapped. The twins were placed in the Illinois School for the Blind and the other child, who was mentally handicapped and also had poor eyesight in addition to a speech problem and a club foot, was placed in another in 1965. In 1967, the child was placed in a foster home 80 miles from the home of the mother. She kept contact with the children and had the twins for visits at her home, but visited with the other child only once after he was placed in the foster home—that visit being in November, 1967. She discussed further visits with various caseworkers but had none due to difficulties in arranging for them. The mother first had to contact one caseworker who would in turn contact another caseworker for arrangements for visits. Transportation difficulties were present. In 1968, she arranged for a visit but was unable to make it because she was sick. She had five personal visits with the caseworkers about the child and had sent birthday, Valentine and Christmas cards and a letter to him. The appellate court reversed the order of adoption holding that the evidence showed that the mother maintained her interest and concern regarding the child's welfare since the original dependency decree.

For comparison purposes, we refer to an opinion of this division filed today affirming an order granting the guardian *ad litem* consent to adopt. (*In re Grant,* 29 Ill.App.3d 731, 331 N.E.2d 219.) In that case, twin sons were determined to be *neglected* children 2 months after birth. The mother, *who had no other children,* had nothing to do with her sons for 5 years. She saw them once in 1973 and once in 1974.

■■ This record reflects a doleful picture of a widow in ill health and on welfare, whose children were taken from her originally through no fault of hers. It is apparent that personal feelings entered into the relationship between the respondent and Miss Wright. The respondent's time was limited. She had been beset with a myriad of problems other than Raymond. Transportation, it may be fairly inferred, was not readily available. We do not have before us a custody order; and it may be that the best interests of Raymond require that he remain in the custody of someone other than the respondent. Rather, we have before us an order which will terminate forever the right of a mother to her child, a "[right] far more precious  *  *  *  than property rights." (*May v. Anderson,* 345 U.S. 528, 533, 97 L.Ed. 1221, 1226, 73 S.Ct. 840.) The petitioner's case here is even weaker than in *Deerwester* and will not support such a drastic result. See *In re Cech,* 8 Ill.App.3d 642, 645-646, 291 N.E.2d 21.

■■ In view of the position that we take on the sufficiency of the evidence it is unnecessary to pass on the constitutionality of the statute nor

the other point raised by the respondent. (*Anundson v. City of Chicago*, 44 Ill.2d 491, 256 N.E.2d 1.) The order is reversed.

Order reversed.

BURKE, P. J., and SIMON, J., concur.