*In re* CURTIS E. MARTIN *et al.*, Minors.—(THE PEOPLE OF THE STATE OF ILLINOIS, Petitioner-Appellee, *v.* CATHERINE AYENDE, Respondent-Appellant.)

(No. 60375; ▮▮▮▮▮▮▮▮)

First District (1st Division)—August 4, 1975.

Barbara A. Caulfield, of Northwestern Legal Assistance Clinic, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon and Kevin Sweeney, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE GOLDBERG delivered the opinion of the court:

This appeal requires us to decide issues of grave importance to the future of three children. They are: Curtis Martin, born October 25, 1958; Estrellita Perrin, born September 19, 1961, and Jackie Perrin, born December 5, 1963. In July of 1963, petitions were filed in the circuit court alleging that Curtis and Estrellita did not have proper parental care. About that time, Catherine Ayende, mother of all three of the children, was a patient in Cook County Mental Health Clinic. The minors were found dependent and remanded to the custody of the State. Thereafter the court returned the two children to the custody of their mother. The third child was born after these proceedings had been taken.

On May 21, 1965, petitions were filed concerning all three of the children, alleging that the mother had been incarcerated in the House of Correction and that prior thereto the children had been inadequately cared for and supervised and inadequately clothed and fed. The court found that all three of the children were dependent and neglected. A guardian was appointed for them with the right to place them in an approved foster home or institution. In September of 1965, the children were placed with foster parents. Regarding this situation, we are informed only that the foster parents then lived in Lombard, Illinois, are named Kelley and have three children of their own.

No further legal action was taken until December 28, 1973, when a supplemental petition was filed by the Illinois Department of Children and Family Services requesting permission for the children to leave the State with the foster parents who were then about to move to Minnesota. The petition alleged that the home would be supervised by the Department of Public Welfare in Minnesota. On January 4, 1974, the mother filed a petition for supplemental relief in which she alleged that she no longer suffered from a previous marital emotional stress; had borne another child for whom she has provided a healthy and proper home environment and she desired return of the three children to her. On January 17, 1974, after a hearing, the circuit court entered an order granting the petition for removal of the children to Minnesota and denying the petition of the mother for custody. The mother has appealed.

In this court the mother contends that the clear weight of the evidence supported a ruling that the children should be returned to her custody; she has exhibited continued concern for the children and is a fit and proper person to care for them and her superior right to the custody of her children should prevail as such custody is in the best interests of the children. The People urge in response that the issue of child custody must be guided by the best interests of the children which requires that they stay in the Kelley home; the trial court properly ruled it was in the best

interests of the children to be granted permission to leave the State and the trial judge properly exercised the wide measure of discretion granted to him in child custody cases.

A child welfare worker testified that this case has been assigned to her since February, 1972. The children were placed in the Kelley home during August, 1965, when Curtis was 6, Estrellita was 3 and Jackie 21 months. The mother visited the children in June, 1970, and thereafter on June 13, 1972 and January 9, 1974. The oldest boy, Curtis, was not included in the 1972 visit. The mother has made no financial contribution to the children. In December, 1972, the mother sent the children Christmas cards. She also telephoned the children some two or three times a year.

The witness also testified that Curtis had a learning disability which was a problem in school. In her opinion, Curtis did not wish to return to his mother. She also stated that it would be desirable for all three of the children to retain contact with their mother but their removal to Minnesota would not cause any problem in this regard. She had discussed with the foster mother the issue of bringing the children back to Chicago during the summer. She stated that she had been advised that the foster father has a private pilot's license in connection with his work so that he could bring the children back. She never at any time told the mother that her visits with the children were detrimental and never sought to discourage her from visitation. The foster parents were moving to Minnesota for reasons of employment. She recommended that the children be allowed to accompany their foster parents to maintain the home environment which they had since 1965, and to promote healthy physical and emotional growth.

Another caseworker has been assigned to the case from late September, 1973, to the present. She has contacted the mother who presently lives with her youngest daughter in a studio apartment containing one bedroom and one couch for sleeping accommodations. In her opinion, that apartment would not be adequate for all the children. She expressed the opinion that the mother did not seem to be aware of the responsibility involved in caring for the children as they approach adolescence.

In December, 1972, another social worker had contacted the mother and had discussed the possibility of her living with the children. Beyond that, the record of this worker indicated only an inability to locate the mother thereafter. The witness further testified that the mother has repeatedly expressed a desire to have the children returned to her custody. The mother stated that she had called the Federal Housing Authority and believed that she would qualify for a four-bedroom apartment, which, in the opinion of the witness, would be adequate. At this time, the mother

is receiving public aid and this stipend would be increased if the three children were returned to her. The witness expressed the opinion that the mother was not an emotionally stable person but seemed tense and under strain perhaps because of the legal problems in connection with custody of the children.

After this testimony, all parties agreed that the court should interview each of the children, separately, in his chambers out of the presence of the parties with the court reporter to take and transcribe these proceedings. At that time (January 17, 1974) the approximate ages of the children were: Curtis–15; Estrellita–12 and Jackie–10. Curtis told the judge that he had lived with the Kelleys for 9 years. He liked his home "real well" and did not want to return to live with his mother. He had not discussed this with his sisters but he thought that Estrellita and Jackie felt the same way, although he did not know for sure about Jackie, and based this upon what he saw. Estrellita told the judge that she did not want to return to her mother but wished to stay with the Kelleys. She liked it there and returning to her mother would be "so different." Jackie said that it was fun living with the Kelleys and they treated her well. She wanted to go with the Kelleys to Minnesota and would be scared about returning to live with her mother.

Two documents appended to the mother's petition were then received in evidence by the court. One letter dated January 4, 1974, directed to the trial judge, was from a teacher of the mother's youngest child. She found the mother very interested in the child's school work. The mother accompanied the child to school and frequently consulted with the teacher regarding her performance and behavior. The mother attends parent interviews and family nights. The child's work is good, she has shown good progress and she is adequately and appropriately dressed. The teacher considered the mother to be conscientious in her care of the child. The remaining letter was written by a psychiatrist who had examined the mother on January 16, 1974. He found that she was concerned about the children and wanted them back. His psychiatric evaluation found her not psychotic or neurotic and found her competent to be a mother. He offered a further report with reasons for these opinions if required.

The parties stipulated that if the mother were to call an additional witness, he would state that she is of good character, is able to care for three additional children in a fit and proper manner and is presently taking excellent care of her youngest child.

The mother testified that she is presently unemployed and receiving public assistance. She last worked as a housekeeper but left that employment shortly prior to the birth of her fourth child. This child became 8

years of age on March 27, 1974. She testified that in a conversation with Curtis he had told her that he wanted to come back to live with her but did not want to hurt the foster parents because they have been good to him. She stated that Curtis had been upset because of the divorce proceedings between her and his father. She thought that it would be best for all of the children to live with her. She has enjoyed a fine relationship with them and she loves them all. Estrellita had told her that she wanted to go with the Kelleys but in her opinion Estrellita was confused and would not talk about it. She had also spoken to Jackie some 2 weeks prior to the hearing. Jackie told her that she loved her and wanted to come home to live with her. She had made arrangements to obtain a four-bedroom apartment probably in Palatine.

She has maintained contact with the children by phone between visits and has sent them money and cards. Prior to 2 weeks before the hearing, she had not seen the children for a long time. She did not remember how long but it was at least a year. She had wished to see the children and made many calls but the social workers kept giving her excuses without results. She had a conversation with another caseworker about it and he told her that he would approve return of the children to her but she never heard from him anymore and did not see him again. She did not wish the children to move to Minnesota because it was too far away and she wanted them closer. She would like for them to come back to live with her.

■■■ The Juvenile Court Act of Illinois took effect on January 1, 1966. The Act expresses its purpose to secure care and guidance for each minor "preferably in his own home." The same portion of the statute further states its purpose and policy as preservation and strengthening of the family ties of a minor whenever possible and "removing him from the custody of his parents only when his welfare or safety or the protection of the public cannot be adequately safeguarded without removal * * *." (Ill. Rev. Stat. 1973, ch. 37, par. 701—2.) This statutory guideline is actually a codification of the well-recognized principle "that a natural parent has a superior right to the custody of his child." (*Giacopelli v. The Florence Crittenton Home*, 16 Ill.2d 556, 565, 158 N.E.2d 613.) This right of natural parents has been described as "an inherent right to the society and custody of their own children." *In re Gonzales*, 25 Ill.App.3d 136, 143, 323 N.E.2d 42, citing *Petition of Breger v. Seymour*, 74 Ill.App. 2d 197, 199, 200, 219 N.E.2d 265.

However, these rights of natural parents are not by any means absolute. On the contrary, they must yield at all times to the paramount factor of the welfare and best interests of the child or children involved. The Juvenile Court Act specifically enjoins that '[[t]he parents' right to

the custody of their child shall not prevail when the court determines that it is contrary to the best interests of the child." (Ill. Rev. Stat. 1973, ch. 37, par. 701—2(3)(c).) In the proceedings before us the issue is not that of fitness of the mother so much as it is the welfare of the children. In that regard, the proceedings are to be contrasted with cases such as adoption matters which involve a permanent severance of all rights and duties flowing from parenthood. (Compare *In re Grant*, 29 Ill.App.3d 731, 331 N.E.2d 219, and *In re Ybarra*, 29 Ill.App.3d 725, 331 N.E.2d 224.) In *Marcus v. Marcus*, 24 Ill.App.3d 401, 406, 407, 320 N.E.2d 581, this court cited a number of cases which adequately set forth the prime importance of consideration of the best interests and welfare of the children involved.

■■ In the case before us, by orders entered in 1965, the court terminated the custody of the mother and the children were accordingly placed in a foster home. This type of order has been described as "a continuing order which is only *res judicata* as to the facts which existed at the time the order was entered and is subject to modification by the court." (*In re Overton*, 21 Ill.App.3d 1014, 1020, 316 N.E.2d 201.) This continuing order is "subject to modification upon reformation or change of conditions." (*In re Ramelow*, 3 Ill.App.2d 190, 198, 121 N.E.2d 41.) The statute provides that custody granted thereunder "continues until the court otherwise directs." (Ill. Rev. Stat. 1973, ch. 37, par. 705—7(5).) Cases of this nature are, in effect, sui generis and each of them must be decided in accordance with the particular facts of each individual and varying situation. *In re Interest of Stacey*, 16 Ill.App.3d 179, 183, 305 N.E.2d 634.

In determining the rights of these parties we must constantly bear in mind that wide discretion is vested in the trial judge to an even greater degree than any ordinary appeal to which the familiar manifest weight principle is applied. In cases involving custody of children, "[t]he trial court is in a position to exercise a large discretion and a reviewing court is reluctant to interfere with the exercise of such choice." (*Davison v. Davison*, 111 Ill.App.2d 186, 189, 249 N.E.2d 298.) In *Marcus v. Marcus* we had occasion to repeat the statement that we will not disturb the determination of the trial court in this type of case "unless it has resulted in manifest injustice or is against the manifest weight of the evidence." 24 Ill.App.3d 401, 407.

In determination of the case at bar, it must be remembered that the children involved have been living in the home of their foster parents since 1965, a period of virtually 10 years. Apparently, they have lived in Minnesota with their foster parents for some time. All of them are presently of school age and the change in residence and, therefore, in schools,

is now an accomplished fact to which they have presumably become accustomed. Aside from any other factor, it would appear unreasonable and unwise to require them at this time to leave Minnesota and return to Cook County. In making this determination, we do not consider the personal fitness of the natural mother to regain custody so much as we do the other circumstances before us. We cannot make financial comparisons between the mother and the foster parents because the record is entirely bare of information regarding the latter. Furthermore, financial comparisons in a situation of this type are of little value since many more important factors deserve consideration. However, the mother would hardly be financially able to undertake the support and education of three additional children solely from payments received from public funds. Apparently she has no other source of income to assist her.

We have no information in this record as to the type of home which the mother is prepared to provide for the children. She has asserted that she would be able to obtain more suitable living quarters than her present situation, but, the record provides us with no substantial information regarding her present homelife and the qualities thereof which may be crucially important in rearing these children. The record does not contain information concerning the foster home, but we do know that the foster parents were selected by a governmental agency created to discharge this function and the children have apparently lived in a congenial atmosphere during the years in the foster home as appears from their statements to the trial judge, the recommendations of the social workers and the ruling of the court. To grant the mother's prayer and restore the children to her custody might well have the result of depriving them of the benefit of a stable and secure home and the company of three other children with whom they have lived for the past 10 years, apparently with a good degree of happiness and a normal adjustment.

■■ Another factor of importance is the private interviews which the trial judge had with each of the children. At that time, the children ranged in age from 10 to slightly over 15. Particularly in the case of the oldest child, their sentiments and desires are of some importance in determining their custody. Since the trial judge spoke to each separately, it can hardly be said that they were influenced in their statements to the court by the desires of the others. On the contrary, it seems to us from this record, that each of these children manifested a sincere wish to remain in the custody of their foster parents. Upon this basis, we cannot conclude that the decision reached by the trial judge in the exercise of his wide discretion is manifestly contrary to the evidence or manifestly unjust. We do not find from this record a sufficient showing of change

in the mother's circumstances which would justify return of the children to her custody.

This observation applies to both portions of the order appealed from. If the petition for leave to remove the children to Minnesota should be denied, the only remaining viable alternative would be to remand the children to the custody of other foster parents in Cook County. Such a disposition would be manifestly unjust and contrary to the best interests of the children.

Finally, we wish to note that we approve the statement made by the trial court that the social workers have indicated that the foster parents, on a voluntary basis, will arrange for the children to be brought back to Cook County so that they may visit with their mother. The court stated that the details of performance of this agreement would be left with the Department of Children and Family Services.

The order appealed from is affirmed in all respects.

Order affirmed.

EGAN and SIMON, JJ., concur.