**George Vandal CARLE, Appellant,**

v.

**Charlotte Ann CARLE, Appellee.**

**No. 1496.**

Supreme Court of Alaska.

Dec. 8, 1972.

---

Michael E. Adams and Hugh W. Fleischer, Alaska Legal Services Corp., Anchorage, for appellant.

Thomas E. Schulz, Gregg, Kohls, Schulz & Fraties, Juneau, for appellee.

## OPINION

Before RABINOWITZ, C. J., and CONNOR, ERWIN and BOOCHEVER, JJ.

RABINOWITZ, Chief Justice.

This appeal concerns the superior court's determination of child custody in a divorce proceeding between George Carle, appellant, and Charlotte Carle, appellee. As part of its decree of divorce, the trial court awarded custody of George Carle, Jr., the parties' 7-year old son, to his mother Charlotte Carle. George Carle has appealed from the superior court's custody determination.

George Carle and Charlotte Carle were married in 1963, when George was 21 and Charlotte 16. George is a Haida Indian whose family is from Hydaburg. Charlotte is a Tlinget Indian with family ties at Klawock.[1] George's primary source of income is employment on commercial fishing boats, although he has worked at other jobs. During the fishing off-season, he leads the traditional subsistence existence of village Alaska, hunting, trapping, fishing, and picking berries. Since the marriage of the parties, Charlotte has held many different jobs and has also attended school. At the time the custody hearing was held in this case, she had been employed in Juneau for some 6 months.

When the matter was before the trial court, Charlotte was living in Juneau with Tom Hughes, a non-Native, with whom she had been living since shortly after she separated from George in 1965. Charlotte and Hughes expressed their intent to marry after her divorce. They also indicated that they hoped to be able to bring Hughes' three children from an earlier marriage into their home in addition to George Jr. and two children of their own union. Hughes and Charlotte work alternate shifts at their respective employments and have outside help for the brief period when their shifts overlap and neither can be home.

George Jr. was born at Mt. Edgecumbe, Alaska, December 20, 1964. He first lived with Charlotte's grandmother in Klawock when Charlotte was working in a cannery for a short time in the summer of 1965.

1. From the time of their marriage in 1963 through the summer of 1965, George and Charlotte lived in Klawock off and on with Charlotte's grandmother. From 1966 to 1968, when the grandmother was taking care of his son, George spent the off-seasons in her home also. In September 1970, George took his son with him to Hydaburg where the boy lived with two of George's sisters—with one during the fall fishing season and with the other from the end of the season through the time of the custody hearing. The custody decree left the child with the latter married sister temporarily so that the boy could finish the year in the Headstart program he had been attending.

He returned to this home when his father brought him back from San Diego where Charlotte had taken him in 1965, and remained there until 1968. In October, 1968, Charlotte's grandmother became ill, so one of her daughters took the boy to Charlotte in Juneau. He stayed with Charlotte about 9 months until her financial situation became so bad that she could not adequately care for her two children.[2] To see that they were properly cared for, she sent them to her grandmother who was at home again in Klawock.[3] George Jr. remained in Klawock until after the 1970 fishing season. His father then came to get him because the grandmother was too old and sick to be able to care for the child any longer. After visiting various relatives, George Sr. took his son to Hydaburg to live with one of the boy's paternal aunts briefly during the fishing season. At the end of the season, George Sr. made more permanent living arrangements for the boy, placing him with another aunt and her family where he could live next door and participate in the boy's upbringing. Had custody been awarded to the father, the boy would have continued to live with this married aunt indefinitely.

 In our jurisdiction it is well established that the trial court is possessed of broad discretion to determine where custody should be placed. We will disturb the trial court's resolution of custody issues only if convinced that the record shows an abuse of discretion, or if controlling findings of fact are clearly erroneous.

King v. King, 477 P.2d 356, 357 (Alaska 1970); Sheridan v. Sheridan, 466 P.2d 821, 824 (Alaska 1970). In the case at bar, the trial court recognized that the paramount consideration in any custody determination is what appears to be for the best interests of the child.[4]

The facts have been set forth in some detail because of appellant George Carle's contentions that the trial court erred in its evaluation of the relevant facts for the purpose of deciding what custody disposition would be in the best interests of the minor child, George Jr. George Carle's argument before this court is two-pronged: first, that the trial court failed to give adequate consideration to the "actual interests" of the child, defined essentially as his psychological well-being; and second, that the trial judge's custody decision was the result of his cultural bias against the Native village way of life. In regard to this latter argument, appellant contends that the trial judge erroneously employed a presumption that the Native village culture is "inevitably succumbing" to the caucasian, urban culture.

 We turn first to the asserted failure of the trial court to consider the actual interests or psychological well-being of the child. George Carle contends that the interests of the child in a custody dispute merit constitutional protection and that due process requires courts to "determine custody according to criteria which assure full and meaningful consideration

---

2. By that time she and Hughes had had one baby. Hughes had gone to Hawaii to work in the summer of 1969, but did not stay much more than a month because of Charlotte's financial status.

3. When Charlotte sought the return of the two children two weeks later, her grandmother would only send back the baby. The grandmother had refused to give up George Jr. to Charlotte once before in 1967. Recognizing her grandmother's great attachment to the boy, Charlotte did not insist on recovering custody either time.

4. AS 09.55.205 provides that in deciding custody, the trial court should be guided

by the following considerations:
 (1) by what appears to be for the best interests of the child and if the child is of a sufficient age and intelligence to form a preference, the court may consider that preference in determining the question;
 (2) as between parents adversely claiming the custody neither parent is entitled to it as of right.
The legislative standard parallels the standard articulated by this court. King v. King, 477 P.2d 356 (Alaska 1970); Sheridan v. Sheridan, 466 P.2d 821 (Alaska 1970); Harding v. Harding, 377 P.2d 378 (Alaska 1962); Rhodes v. Rhodes, 370 P.2d 902 (Alaska 1962).

of the child's actual interest."[5] According to the father, this would mean focusing primarily on "the actual psychological interests of the child," and more particularly, on "the existence and quality of . . . emotional relationships between the child and his possible custodian." We agree that the nature of the child's existing relationships should be a significant factor in choosing his custodian. Nevertheless, we believe that the "best interests" criterion adequately encompasses this factor.

■ Even were we to adopt the father's position and focus primarily on the actual psychological interests of the child the evidence does not clearly require a different result as to the choice of custody. The child's most stable, continuous, and long-lasting relationship was with his great-grandmother who can no longer care for him. He has spent relatively little time in 7 years with his mother, but his contacts with his father have been transitory also.[6] The child has related well to both parents and to the respective living situations they offered him. Moreover, the trial court's decision frequently touched on elements of the child's relationship with others—with his aunt and her family, with Hughes, with his school in Hydaburg. In fact, it was precisely his concern for the child's psychological development that led the judge to place him with his mother in Juneau. In his decision the trial judge found that the child's mother had obtained stable employment and possessed the means of providing good care for the child; that the mother and Hughes provided a sense of family and home for the child, "a settled place of security and safety"; that the paternal aunt could not fulfill the necessary filial relationship; that placing the child in the mother's custody provided greater assurance of a settled, stable, family environment for the child; and that the mother was in a position to materially aid the child's development of a sense of identity, worth, and self confidence. The trial court was also of the view that the transition from the village to urban way of life could be more easily accomplished while the child was still young than if delayed until his character and personality were more rigidly formed.[7] In short the trial court concluded that the child would be emotionally and economically more secure in an urban setting.

■ The father asserts that the trial court failed "to give sufficient recognition to the traditional manner of care and up-

5. Whether or not a constitutional right of the child is involved, parents have standing to challenge on appeal a determination of what is in the best interests of the child. See, e. g., Sheridan v. Sheridan, 466 P.2d 821 (Alaska 1970); Bass v. Bass, 437 P.2d 324 (Alaska 1968); Rhodes v. Rhodes, 370 P.2d 902 (Alaska 1962). We deem this an appropriate occasion to reiterate the point we made in Sheridan v. Sheridan, 466 P.2d 821, 825 n. 16 (Alaska 1970) to the effect that in contested custody cases the trial court, in its discretion, is empowered to appoint a guardian ad litem to represent the interests of the minor child. See Alaska Civ.R. 17(b); Alaska R.Child.P. 11.

6. While there might be some preference for leaving the child in the custody of the person with whom he has most recently and continuously resided, we decline to establish such a presumption lest it lead to pre-hearing maneuvering for possession of the child. In any event such a rule would have been no help in the instant case where neither parent actually has lived with George Jr. for long or continuous periods.

7. As to the quality of emotional relationships between the child and his possible custodian, in his decision the trial judge alluded to the fact that the father's hearing loss and speech difficulties hampered his ability to readily communicate; that the father's occupation as a commercial fisherman requires that he be absent for several months during fishing season; that the father did not have a home of his own in which to care for the child; that the father's capacity to provide the necessities of life for himself and his son was limited; and that the father's married sister cared for and loved the child and that it was not an unusual facet of Native village culture to provide care and a home when the child's natural parents are unable to do so.

bringing of Native children" in weighing the custody alternatives available to the minor child of the parties. This assertion is not borne out by the record. Throughout the custody hearing the trial judge allowed evidence bearing on the nature and quality of village life. Before hearing final argument, the trial judge indicated what he thought was the most important question for counsel to discuss. In doing so, he said that the custody alternatives offered were perhaps somewhat unique and that

> I'm most fundamentally faced with a decision whether this child is to be reared in a Native culture in a village or in the Anglo-Saxon culture in a developed community. And I'm concerned about the basic differences between the environmental circumstances of the village life on the one hand, where his family associations are offered, apart from the specific capabilities of the [father], and on the other hand, the advantages and disadvantages of a different way of life.

Finally, in his oral decision the trial judge explicitly recognized that it is common in villages for members of the extended family to assist the natural parents of a child in his rearing, and that the village offered certain advantages to children raised there.[8] More particularly, the trial court recognized that George Jr. was then being well and lovingly cared for in his aunt's home.

From an overall appraisal of the record, it appears that the trial court's decision to award custody to the mother was influenced by the view that there existed a great probability of a more stable home, emotionally and economically, if the mother was awarded custody.

■ This brings us to appellant's second argument to the effect that the trial court's custody decision was dictated by the court's cultural bias against the Native village way of life and denied the child the "right of cultural survival." This contention arises out of the trial judge's statement made in the course of his decision that

> Inevitably, the village way of life is succumbing to the predominate [sic] caucasian, urban society of the land, and of necessity the youth of the villages must confront and adjust to this new life style. That transition can more easily be accomplished in the case of this child at his young age than if delayed until his character and personality are more rigidly formed.

In light of these comments, the closeness of the custody question and the fact that the child's best interests were not independently protected by the appointment of a guardian ad litem,[9] we have concluded

8. The trial court's findings of fact, where pertinent, read as follows:

> The evidence indicated that it is not unusual in the village culture for the relatives of a child, such as the paternal aunt here, to provide a home and care for a child where for some reason the natural parents are not suitably situated to do so. In this case, the boy does appear to be loved and accepted in his aunt's home and family in Hydaburg. The evidence also indicated that he is currently doing well in a so-called 'Headstart' program in the village school.

> . . . . .

> From the evidence it may be said there are, indeed, some significant and praiseworthy values in the Native village cultural environment in which the boy

> would be reared under defendant's custody. These include a rapport with nature and with a community of people which is perhaps less characteristic of urban life. The village environment may well nurture a sense of pride and self-worth in this Native child which a community such as Juneau could tend to suppress in his status as a member of a minority race.

9. See n. 5, supra. During the course of the trial the trial judge remarked that the issue before him "really concerns a party who is in a sense not represented in this suit." Although counsel was not appointed to represent the child, the trial judge alluded to the fact that in the past he contemplated such appointments.

that the case should be remanded for further proceedings. We are reluctant to finalize the decree in this case, given the possibility that an improper criterion was employed by the court in its resolution of the custody issue. Admittedly, the precise meaning of the trial judge's assertion that "the village way of life is succumbing to the predominate [sic] caucasian, urban society" is not free of ambiguity. Similarly, it is not clear whether the trial judge was suggesting that the Native youth must necessarily adopt urban life-styles. Yet, on the basis of the trial judge's questioned remarks, we think a cogent argument can be advanced that the custody issue here was decided in part through the utilization of an impermissible criteria.

Both judicial decision and statutory provision mandate that the paramount consideration in any custody determination is "what appears to be for the best interests of the child." We think it is not permissible, in a bicultural context, to decide a child's custody on the hypothesis that it is necessary to facilitate the child's adjustment to what is believed to be the dominant culture. Such judgments are, in our view, not relevant to the determination of custody issues. Rather, the focus should be on the fitness of the parent and the parent's ability to accord the child the most meaningful parent-child relationship. It is not the function of our courts to homogenize Alaskan society. Recently we had occasion to observe that, "The United States of America, and Alaska in particular, reflect a pluralistic society, grounded upon such basic values as the preservation of maximum individual choice, protection of minority sentiments, and appreciation for divergent lifestyles." [10] Since we are unable to conclude with any degree of certainty that custody was decided without taking into consideration impermissible factors, we hold that the case must be remanded for further proceedings.

We think it necessary to comment on one other facet of the proceedings below.

Here the differing lifestyles flowing from the two cultures have significance in determining which parent could provide the best possible parent-child relationship. In such circumstances, we deem it inappropriate to decide the custody issue on the basis of cultural assumptions which are not borne out by the record. Rational decision-making requires, as a necessary prerequisite, a solid evidentiary base upon which evaluation can be made of these factors as they relate to the primary question of what custody disposition is in the best interests of the child.

We therefore reverse and remand to the superior court for further proceedings not inconsistent with the foregoing. Upon remand, the superior court is empowered to appoint a guardian ad litem for the child, and to take such other steps as are deemed appropriate, including the taking of additional evidence in the event any party raises issues as to changed circumstances arising since trial that bear on the custody issue.

10. Breese v. Smith, 501 P.2d 159, 169 (Alaska 1972).