**In the Matter of S. D., JR., et al.**
**No. 2530.**

Supreme Court of Alaska.
April 7, 1976.

---

Richard Svobodny, of Alaska Legal Services, Juneau, for Mr. and Mrs. D. (parents).

Paul Hoffman of Robertson, Monagle, Eastaugh & Bradley, Juneau, guardian ad litem for D. Children.

Before BOOCHEVER, C. J., CONNOR, ERWIN and BURKE, JJ., and DIMOND, Justice Pro Tem.

## OPINION

BOOCHEVER, Chief Justice.

The parents of S.D., Jr., M.D., A.D. and I.D.,[1] minor children, appeal from an adjudication that their children were dependent minors and from a subsequent disposition which placed the children in the custody of the Department of Health and Social Services for a period of two years. It is contended that insufficient evidence was presented to justify a finding of dependency, and that in the dispositive phase of the proceedings, there was no sufficient showing that removal of the children from the family home was in the children's best interests. For the reasons hereinafter set forth, we affirm the decision of the superior court.

On March 7, 1975, four petitions were filed in the superior court by Gary Bluhm, a social worker employed by the Division of Family and Children Services of the Alaska Department of Health and Social Services. The petitions indicated that the

---

1. At the time of these events, I.D. was 11 years of age, A.D. was 9, M.D. was 7 and S.D., Jr. was 3.

D. parents were observed to be very intoxicated on March 5, 1975, and that for the previous four days, the three school-age children had not attended school so as to bring the children under the purview of AS 47.10.010(a)(5) as lacking proper parental care by reason of faults and habits of the parents.

At an emergency custody hearing on March 11, 1975, Judge Stewart determined that the D. children should remain in the temporary custody of the State of Alaska pending a final adjudication of the juvenile petitions. On March 14, 1975, a hearing was conducted on the merits of the juvenile petitions. The court adjudged the four children to be dependent minors under Title 47 and ordered that temporary custody remain in the state until the disposition hearing.

At the disposition hearing on April 7, 1975, the children were represented by the court-appointed guardian ad litem. The court considered recommendations from the Division of Family and Children Services, the guardian ad litem and counsel for Mr. and Mrs. D.

In its order of disposition, the court adopted the recommendations of the guardian ad litem with a few modifications. Custody of the children was to remain in the State of Alaska, Department of Health and Social Services, Division of Family and Children Services. The four children were to remain together at the Alaska Youth Village[2] until June 1, 1976, at which time they would be returned to their parents if the parents could demonstrate their ability to provide a stable home, overcome their drinking problems and hold or at least seek continuous employment. The children were to remain in legal custody of the State for one year after June 1, 1976 even if they had been returned to their parents. The Division of Family and Children Services was ordered to work with the parents, particularly on the problem areas of excessive drinking, inability to hold continuous employment, any illness of the parents and the over-all inability of the parents to discipline themselves in order to provide a stable home. Regular visits between parents and children at the Alaska Youth Village and outside the institution were allowed by the order.

From the court's findings and order, filed on April 8, 1975, the parents of the dependent minors bring this appeal.

A child hearing is divided by Alaska Rules of Children's Procedure 12(a)[3] into two phases, the adjudicative phase and the dispositive phase. This appeal raises questions about both phases of the hearing in the case of the D. children:

1. At the adjudicative phase, were the facts presented of a sufficient nature for a finding of dependency as a matter of law?

2. At the dispositive phase, did the court err in removing the minors from their parental home?

I

THE ADJUDICATIVE PHASE OF THE HEARING

Under the circumstances of this case, the adjudicative phase of the hearing was

---

2. The children had been in the Alaska Youth Village on other occasions, thus they were not moving into a totally strange environment.

3. Children's Rule 12(a) specifies:
 (a) *Phases of Hearing.* The child hearing consists of two phases—the adjudicative phase and the dispositive phase.
 (1) *Adjudicative Phase.* The adjudicative phase determines the issue of delinquency or dependency, or both, or need of supervision, according to allegations of the petition for adjudication. These issues may be determined either by the admission or confession of the party or by the taking of evidence.
 (2) *Dispositive Phase.* The dispositive phase consists of the measures taken and the orders issued by the court with respect to the child or his parents, guardian, or custodian, designed to correct any undesirable situation found in the adjudicative phase.

for the purpose of determining the issue of dependency.

Mr. and Mrs. D. argue that the facts presented to the court during the adjudicative phase were not sufficient for a determination that the D. children were dependent minors as a matter of law under AS 47.10.010(a)(5) and AS 47.10.290. AS 47.10.010(a)(5) reads as follows:

(a) Proceedings relating to a minor under 18 years of age residing or found in the state are governed by this chapter, except as otherwise provided in this chapter, when the minor

. . . . . .

(5) lacks proper parental care by reason of faults, habit or neglect of his parent, guardian or custodian.[4]

AS 47.10.290(3) provides that a

"dependent minor" is a minor whom the court determines is within the provisions of § 10(a)(4), (5), (6), (7), (8), or (9) of this chapter.

Thus, in order for the children to be adjudged dependent minors, it was necessary for the court to find that the children lacked parental care by reason of faults, habit or neglect of the parents.

■■ Children's Rule 8(d)(3) states that the petition for adjudication shall include "[a] brief statement of the facts which bring the child within the court's child jurisdiction". This rule must be read in conjunction with Children's Rule 12(a)(1), which states that the issue of dependency is determined according to allegations of the petition for adjudication.[5] Thus, at the adjudicative phase of any children's proceeding, the family court may consider only the specific situations set out in the petition.[6]

The petition for the youngest child, S.D., Jr., stated:

On March 5, 1975, in Juneau, Alaska, Mr. and Mrs. S. D. were observed to be very intoxicated for the past 4 days which brings minor under purview of AS 47.10.010, subsec. (5)[(a)(5)] lacks proper parental care by reason of faults and habits of his parents.

The petitions for each of the three other children stated:

On March 5, 1975, Mr. and Mrs. S. D. were observed to be very intoxicated and that for the past 4 days the above minor had not attended school which brings her (him) under the purview of AS 47.10.010 (5)[(a)(5)] lacks proper parental care by reason of faults and habits of her (his) parents.

Thus the petitions indicate that the specific situation to be considered by the family court was the parents' intoxication and the children's absence from school during the time specified.

---

4. None of the parties in the instant case attacked the validity of the statute at trial or appeal. Since the issue was not raised by either party in the court below or set forth and briefed as a statement of points on appeal, we do not consider the issue to be before this court. *See Moran v. Holman*, 501 P.2d 769, n. 1 at 770 (Alaska 1972); *Weaver v. O'Meara Motor Co.*, 452 P.2d 87, 93 (Alaska 1969); *Whaley v. State*, 438 P.2d 718, 723–24 (Alaska 1968); *Sanuita v. Common Laborer's and Hod Carriers Union*, 402 P.2d 199, 201 (Alaska 1965); *Lumberman's Mutual Cas. Co. v. Continental Cas. Co.*, 387 P.2d 104, 109 (Alaska 1963).

5. Children's Rule 12(a)(1) defines the adjudicative phase as follows:
The adjudicative phase determines the issue of delinquency or dependency, or both,

or need of supervision, *according to allegations of the petition for adjudication*. These issues may be determined either by the admission or confession of the party or by the taking of evidence. (emphasis added)

6. At the emergency custody hearing and at the dispositive phase of the dependency hearing, evidence was offered by the State concerning other problems of the D. children caused by their parents' drinking besides absenteeism from school and the parents' history of drinking problems and neglect of their children. Such evidence cannot be considered in the adjudication of dependency since it is beyond the scope of the petition for adjudication.

The older children's petitions stated that they had not attended school for the past four days. Since two of the past four days (March 1 and 2, 1975) were on a weekend, it seems logical to read these petitions as referring to the past four school days.[7] This would make the petition refer to the time from February 27 to March 5, 1975.

The trial court limited its oral findings to the matters alleged in the petition limiting the time under consideration to the period from February 27 through March 5. During that period of time, he found "that both Mr. and Mrs. D. were under the influence of alcohol, that as a result of that these children were not in school". The court concluded that the faults of the parents resulted in lack of parental care.

▆▆ Under Children's Rule 21, unless the child is charged with an act which may result in his incarceration, the standard of proof is by a preponderance of the evidence.[8] We must therefore determine whether there was proof by a preponderance of the evidence that the children lacked parental care by reason of the fault, habit or neglect of the parents. In reviewing the decision of a trial court based on a contention that insufficient evidence has been presented, we must view the evidence and all reasonable inferences deducible therefrom in the manner most favorable to the prevailing party,[9] in this case, the State. The findings of the trial court will not be overturned unless clearly erroneous.[10]

Before discussing the evidence we shall look to case authority regarding the requirements for a finding of dependency. Unfortunately, we find little nourishment from cases decided in other jurisdictions since statutory requirements vary widely and most dependency issues arise in the context of attempts to terminate parental rights so that the dependent child may be adopted.[11] In discussing analogous considerations pertaining to child neglect cases, it has been stated that there is no fixed standard and each case must be judged on its particular facts.[12]

---

7. Mr. and Mrs. D. argue that "the past 4 days" in the petition should be literally interpreted. However, there was testimony that the children were absent from school on February 27, 28 and March 3, 4 and 5, which would corroborate the other interpretation.

8. Children's Rule 21(a) specifies:
 (a) *Standard of Proof.* In determining the issues of delinquency, dependency or need of supervision in the adjudicatory phase of a children's proceeding, the standard of proof shall be as follows:
 (1) If a child is charged with any act which may result in his incarceration, there must be proof beyond a reasonable doubt.
 (2) In other cases, the proof shall be by a preponderance of the evidence.
 For contrast as to standard of proof for determining a parent's fitness, see *In the Matter of K.S.*, 543 P.2d 1191 (Alaska 1975).

9. *City of Fairbanks v. Smith*, 525 P.2d 1095 (Alaska 1974); *Hughes v. State*, 513 P.2d 1115 (Alaska 1973); *Graham v. Rockman*, 504 P.2d 1351 (Alaska 1972). We view the test to be used in weighing the evidence in children's proceedings to be the same as used in adult proceedings.

10. A clearly erroneous finding which may be set aside or on review is one which leaves the supreme court with a definite and firm conviction on the entire record that a mistake has been made, although there may be evidence to support the finding. *A & G Construction Co., Inc. v. Reid Brothers Logging Co., Inc.*, 547 P.2d 1207 (Alaska 1976); *Peters v. Juneau-Douglas Girl Scout Council*, 519 P.2d 826 (Alaska 1974).

11. The problem in looking to cases dealing with termination of parental rights is that they present the more extreme factual patterns of parental fault and improper care. Few cases are appealed from a finding of dependency alone where parental rights have not been terminated. The Alaska cases involving termination of parental rights are not relevant since the improper parental conduct alleged is abandonment of the child, see *In re B.J.*, 530 P.2d 747 (Alaska 1975); *Adoption of V.M.C.*, 528 P.2d 788 (Alaska 1974); *In re Adoption of A.J.N.*, 525 P.2d 520 (Alaska 1974); *D.M. v. State*, 515 P.2d 1234 (Alaska 1973), or unfitness of the parent, see *In re K.S.*, 543 P.2d 1191 (Alaska 1975); *Turner v. Pannick*, 540 P.2d 1051 (Alaska 1975).

12. *In the Interest of Stacey*, 16 Ill.App.3d 179, 305 N.E.2d 634, 638 (1973).

Intoxication has been an issue in a number of cases. Most of the cases, however, involve termination of parental rights and, as might be expected for such an extreme remedy, flagrant dereliction of duty. Thus, in addition to drunkenness, other factors have been involved such as: imprisonment after involvement in criminal activities;[13] placing the child continuously with someone else due to inability to care for the child because of heavy addiction to alcohol;[14] severe physical abuse of the child;[15] and sexual promiscuity coupled with severe intoxication on several occasions when attempting to care for the child, including one occasion when the mother spilled the child out of its buggy and fell into a ditch herself, remaining there for a substantial time.[16]

In *In re J.M.*, 131 Vt. 604, 313 A.2d 30 (1973), the court found that there was not enough evidence for a finding of neglect where the mother had on occasion used intoxicants in excess and slept late in the mornings. The father was rarely home during the children's waking hours, but this was due to his employment. The only child in question was a 6-month-old baby, and there was no evidence that he was affected in any way by the mother's drinking. In the absence of evidence of physical abuse, immoral environment or lack of proper food or clothing, the court held that this was not enough evidence to find neglect—even though the four older children had been removed from the home because of parental neglect.

There has been only one prior case under AS 47.10.010(a)(5) involving a dependency determination which has reached this court. That case, In re P.N., 533 P.2d 13 (Alaska 1975), involved a father's sexual molestation of his ten-year-old daughter. The aggravated facts involved in *P.N.* prevent it from being of guidance as to the question in issue here. In determining standards for a finding of dependency, we must in part be guided by the results of such a finding. If a finding of dependency alone were to have the effect of automatically terminating such an important relationship as that of parent and child, obviously much more substantial evidence would be required than if the result was the release of the child to the parents under some supervision by a state agency. Yet such divergent results at the dispositive phase may follow a finding of dependency at the adjudicative phase.[17] The terms "fault" and "lack of

---

13. *In the Interest of Kester*, 228 N.W.2d 107 (Iowa 1975).

14. *In re S.M.*, 39 Cal.App.3d 40, 113 Cal. Rptr. 847 (1974).

15. *In re J.Z.*, 190 N.W.2d 27 (N.D.1971).

16. *In re Johnson*, 9 Wis.2d 65, 100 N.W.2d 383 (1960).

17. AS 47.10.080(c) specifies:

 (c) If the court finds that the minor is dependent, it shall

 (1) order the minor committed to the department for an indeterminate period of time not to exceed the date the minor becomes 19 years of age, except that the department may petition the court for continued supervision for an additional one-year period for minors who have not responded to treatment;

 (2) order the minor released to his parents, guardian, or some other suitable person, and, in appropriate cases, order the parents, guardian, or other person to provide medical or other care and treatment; if the court releases the minor, it shall direct the department to supervise the care and treatment given to the minor; the department's supervision may not extend past the date the minor reaches majority, except that the department may petition the court for continued supervision for an additional one-year period for minors who have not responded to treatment; or

 (3) by order, terminate parental rights and responsibilities of one or both parents and commit the child to the department or to a legally appointed guardian of the person of the child, if one of the following conditions exists:

 (A) Each parent, or the surviving parent, or one parent if the other has been deprived of custody and visitation rights wishes to relinquish the child to the department or to a legally appointed guardian of the person of the child for adoptive purposes, and the relinquishment is in writing, signed and acknowledged before the court or duly

parental care" encompass a wide variety of conduct and results therefrom. To justify the threshold finding of dependency, the faults must be sufficiently grievous and the results must so adversely affect the child as to justify, at the minimum, state interference to the extent of supervision of the parent-child relationship.[18] It is this minimum standard with which we are concerned in the "adjudicative" stage of the proceedings. It is in fashioning a remedy at the "dispositive" stage that the degrees of fault and lack of parental care must be evaluated.

■■ The parents concede that "it certainly can be argued that the intake of alcoholic beverages is a fault". While the legislature has expressed the view that

> alcoholics and intoxicated persons should not be criminally prosecuted for their consumption of alcoholic beverages and that they should be afforded a continuum of treatment so they may lead normal lives as productive members of society,[19]

drunkenness over an extended period of time, at least in the context of child care, must be considered as a fault. We have stated that the Uniform Alcoholism and Intoxication Treatment Act incorporates into the law the realization that alcoholism is a disease.[20] The petitions with which we are concerned are not based on the disease of alcoholism, as such, but on observations of extensive intoxication dur-

ing a period of six days. Even, however, if the intoxication under these circumstances is to be considered a disease, it does not mean that it cannot be regarded as a fault. A fault is a flaw or defect.[21] For example, insanity is a form of mental illness. While no moral opprobrium should be attached to such a condition, insanity or other severe mental illness could still constitute a fault or defect in the context of child care. Although an isolated incident of intoxication of short duration might not be considered sufficient to constitute a fault for the purposes of a dependency finding, we hold that intoxication over an extended period of time does constitute a "fault" under the provisions of AS 47.10.010(a)(5).

■ As we have previously indicated, the fault must be related to the "lack of parental care" of the child. Thus, we must determine whether the use of alcohol resulted in a lack of proper care for M.D., A.D. and I.D. Looking to the term "lacks proper parental care", it is apparent that it may be manifested in many ways. Failure to properly clothe, feed, maintain cleanliness, supervise and guide children under varying circumstances could justify such a finding. Preventing children from attending school over an extended period of time without some justifiable reason evidences such a lack of proper parental care.[22] Such a standard has been adopted

---

authorized representative of the department and filed with the court;

(B) the child has been abandoned for a period of not less than six months by

(i) both parents, or

(ii) the surviving parent, or

(iii) one parent if the other has been deprived of custody and visitation rights;

(C) each parent, the surviving parent, or one parent if the other has been deprived of custody and visitation rights has been judicially determined to be of unsound mind and the disability has not been removed and the parent has been hospitalized for reasons of mental illness diagnosed as permanent or of long duration; or

(D) each parent, or the surviving parent, or one parent if the other has been judicially deprived of custody and visitation

rights, has demonstrated by his conduct, proven by clear and convincing proof amounting to more than a preponderance of the evidence that he is unfit to continue to exercise his parental rights and responsibilities.

18. *In the Matter of L.A.M. v. State*, 547 P. 2d 827, (Alaska 1976); *In the Interest of Kester*, 228 N.W.2d 107 (Iowa 1975).

19. AS 47.37.010. *See Peter v. State*, 531 P.2d 1263 (Alaska 1975).

20. *Peter v. State, supra*, 531 P.2d at 1271.

21. Webster's New International Dictionary (2d ed.).

22. *In re Currence*, 42 Misc.2d 418, 248 N.Y.S. 2d 251 (1963). *See In re Miller*, 12 A.D.

as the law of Alaska by AS 14.30.010 which, with certain exceptions not applicable here, mandates that parents of children between the ages of 7 and 16 years of age shall insure that the child is not absent from school.

Examining the evidence presented to the superior court and the inferences therefrom in the light most favorable to the state,[23] we hold that it was sufficient to justify the trial court's findings that during the period of February 27 through March 5, the parents were under the influence of alcohol and, as a result, the children were not in school.

Mr. D. admitted that he was drinking some alcohol from February 27 through March 5, 1975. Mrs. D. testified that she drank some alcohol on February 28, and that alcohol was "like poison" to her. A Juneau police officer, a counselor for the Alcoholism Central Agency and the state social worker assigned to the D. family testified as to Mr. and Mrs. D.'s extreme intoxication on March 4 and 5, 1975. The children's school principal testified as to Mr. D.'s apparent severe intoxication on February 27, and A.D. told the judge in chambers that his father was drinking heavily and that his mother was drinking some wine every day while the family was at his aunt's house in town,[24] a period that encompassed February 28 through March 5. During that period of time, Mr. D.'s condition prevented him from driving a car. On March 5, neither Mr. nor Mrs. D. was in a condition to react to an emergency. Without detailing all of the sordid facts, it is sufficient to state that the evidence indicated heavy intoxication over an extended period of time.

There is no dispute over the unexcused absences from the school in which the children were enrolled on February 27, 28, March 3, 4 and 5, and there was ample evidence of the relationship between the parent's intoxication and such absences. Mr. D. testified that he had a car and could have driven the children to school, but his drinking prevented him from driving. A.D. told the judge in chambers that he was trying to get to school, but his father would not help because of his drinking. Mr. and Mrs. D. refused A.D. bus fare so that he might go to school from his aunt's house, although Mr. D. stated at the hearing that A.D. was old enough to take the bus by himself. Mrs. D.'s sickness, which prevented her from seeing that her children got to school, seems to have been brought on by her drinking, although she knew alcohol was "like poison" to her.

■ Since there was ample evidence for the court's findings that the parents were under the influence of alcohol during the period from February 27 through March 5 and that, as a result, the children were not in school, we hold that it was not error to adjudicate that the children were dependent children.[25]

---

2d 890, 209 N.Y.S.2d 964 (1961), where the court suggested that proof might be adduced that the child was neglected because he was unlawfully kept out of school, one of the grounds in the New York neglect statute.

23. *See* note 9 *supra*.

24. The D. family lived 13 miles outside the City of Juneau. On February 27, 1975, the family moved to the house of Mr. D.'s sister in the City of Juneau.

25. We note that the issue of unexcused absence from school does not apply to the preschool child. Consequently, we question whether there was sufficient evidence presented in the youngest child's case to adjudicate him a dependent minor. Even though Mr. and Mrs. D.'s intoxication resulted in the older children not attending school, it may not necessarily be concluded that there was a lack of parental care of S.D. Nor was a great deal of evidence presented as to such a failure of proper parental care. In fact, the parents contend that all of the children were adequately clothed and supervised during the time mentioned in the petition. No separate arguments for the youngest child were raised at either phase of the child hearing or on appeal, although the parents and children were both represented by counsel. We do not reach this issue since it was not

## II

### THE DISPOSITIVE PHASE

The parents' contentions that the court erred in removing the children from the parental home is based on two arguments:

1. That the state had the burden of proof by a preponderance of the evidence that removal from the home is in the best interests of the children and that it failed to meet that burden; and

2. That the right of parents to the care, custody and control of their children is a fundamental constitutional right which may only be infringed upon for a legitimate state purpose by the least restrictive alternative, and that removal of the children from the parental home is not the least restrictive alternative.

As to the first contention, we agree that the standard to be applied by the court at the dispositive phase of the hearing is "the best interests of the child". That standard has been consistently applied in the closely analogous divorce custody situations.[26] We have also stated that such a standard should be used in the final decision with reference to an adoption.[27]

We further agree generally with the parents and the array of contemporary authorities presented[28] that removal of children from the family home may be a drastic, traumatic and emotionally damaging experience which is justified only under extreme conditions. Children should, if at all possible, be maintained in their homes with society providing the supportive services necessary to keep the family together.[29] That does not

raised at any time by counsel for the children or parents, but we note that the parents are entitled under Children's Rule 28, on good cause being shown, to a review of an order of the children's court at any time. Children's Rule 28(a) and (b) reads as follows:

> (a) *Annual Review.* Excepting orders terminating parental rights, the children's court shall annually review its effective orders. The court may review its orders more frequently to determine whether such orders continue to be in the best interest of the child or the public.
>
> (b) *Review upon Application.* For good cause shown the child, his parents, guardian, or custodian are entitled to review at any time upon application therefor.

26. AS 09.55.205(1); *Horton v. Horton*, 519 P.2d 1131 (Alaska 1974); *Nichols v. Nichols*, 516 P.2d 732 (Alaska 1973); *Curgus v. Curgus*, 514 P.2d 647 (Alaska 1973); *Carle v. Carle*, 503 P.2d 1050 (Alaska 1972).

27. *In the Matter of the Adoption of K.S.*, *supra*, we distinguished the final decision from the initial determination of whether a mother was an unfit parent, much as in this case where we have distinguished between the adjudicative and dispositive phase. *See also Turner v. Pannick*, *supra*.

28. California State Social Welfare Board, Report on Foster Care: Children Waiting (September 1972); DeFrancis, Child Protective Services—Community Process (1964); Littner, Some Traumatic Effects of Separation and Placement (Child Welfare League of

America 1956); Glickman, "Treatment of the Child and His Family after Placement," 28 Soc.Serv.Rev. 276 (1954); J. Bowlby, Child Care and the Growth of Love (2nd ed. 1965); Foster Care in Question: A National Reassessment of 21 Experts (H. Stone, ed. 1970); A. Freud and D. Burlingham, War and Children (1943); Goldstein, Freud & Solnit, Beyond the Best Interest of the Child (1973).

29. I. e., homemaker training, child care, job placement, income supplements, alcohol rehabilitation, psychological counseling, and psychiatric therapy. Some jurisdictions require state efforts to maintain the family relationship in juvenile proceedings. For example, California Welfare and Institutional Codes, Sec. 502 provides:

> The purpose of this chapter is to secure for each minor under the jurisdiction of the juvenile court such care and guidance, preferably in his own home, as will serve the spiritual, emotional, mental, and physical welfare of the minor and the best interests of the State; to preserve and strengthen the minor's family ties whenever possible, removing him from the custody of his parents only when his welfare or safety and protection of the public cannot be adequately safeguarded without removal; and, when the minor is removed from his own family, to secure for him custody, care, and discipline as nearly as possible equivalent to that which should have been given by his parents. This chap-

mean, however, that when reasonable efforts to maintain a minimally suitable home environment have failed, other alternatives may not be utilized, and the Alaska Statutes present the judge with a wide range of alternatives.

Determination of the standard to be applied by the court, however, is not tantamount to establishing a burden of proof requirement. Such a requirement has been set forth in AS 47.10.080(c)(3)(D), which necessitates clear and convincing proof by more than a preponderance of the evidence before parental rights and responsibilities may be terminated due to a parent's unfitness to exercise them. No such requirement has been set forth in situations such as this where termination of parental rights is not involved.[30]

In opposition to the parents' position, the guardian ad litem contends that once the state has proved by a preponderance of evidence at the adjudicative hearing that the child lacks proper parental care, the burden should shift to the parents to show that immediate neglect would not occur if the children were returned to their custody.

 Although each party argues that the other should have the burden of proof, we believe that, in cases other than termination of parental rights, placing the burden of proof on either is inappropriate. The dispositive phase of the proceeding is analogous in some respects to sentencing in a criminal case. In both instances, the findings which brought the person under the statute have been made at a prior court proceeding; the sole issue before the court is what disposition is to be made so as to meet the needs of the person and of society. The dispositive proceeding is not a trial, and the court may look to evidence which would not legally be admissible in the prior proceeding. No party is called on to prove its case but rather to make recommendations. The court is allowed to exercise its discretion in making a disposition, guided in a ciminal sentencing by the goals set out in *State v. Chaney*, 477 P.2d 441, 444 (Alaska 1970), and in the dispositive phase of a child hearing by the more ephemeral goal of the "best interest" of the child.

Since we hold that a burden of proof is not applicable to a dispositive hearing other than when termination of parental rights is involved, the question as to whether such a burden was met is irrelevant.

 The issue as to the propriety of the disposition is raised by the parents' additional contention that they have a constitutional right to the care, custody and control of their children. We agree that the right of parents to the care, custody and control of their children is an important and substantial right protected by, although not specifically enumerated in, both the United States and Alaska Constitutions.[31] Counsel argues that when a

---

ter shall be liberally construed to carry out these purposes.

Minnesota Statutes Sec. 260.011 is substantially identical.

The purpose of the Colorado Children's Code is to "strengthen family ties whenever possible, including improvement of the home environment". C.R.S. '73 19–1–102.

33 Vermont Statutes Sec. 631(a)(3) says that the state should allow children to remain in their family environment whenever possible, separating them from their parents only when necessary for their own or society's welfare.

30. We note that the judgment placed the children in a specific group home, the Alaska Youth Village, for a specified period of time. The issue has not been raised on this appeal as to the authority of the court to designate a specific institution or period of time, and we therefore do not pass on that issue. *But see A.A. v. State*, 538 P.2d 1004 (Alaska 1975); *In re P.N.*, 533 P.2d 13 (Alaska 1975), and the apparent conflict between AS 47.10.080(c)(1) and Children's Rule 22(f). The Children's Rules are in the process of revision at this time.

31. *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 1212, 31 L.Ed.2d 551, 558 (1972); *May v. Anderson*, 345 U.S. 528, 73 S.Ct. 840, 97 L.Ed. 1221 (1953); *Prince v. Massachusetts*, 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944); *Meyer v. Nebraska*, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923); *D.M. v. State*, 515 P.2d 1234 (Alaska 1973).

state infringes on such a constitutional right, it must be for a legitimate state purpose, and then only by choosing the least restrictive alternative—the least drastic means—which will effectuate that purpose. *Shelton v. Tucker,* 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960). The "least restrictive means" principle has been applied by the courts in cases involving freedom of speech and association, travel, mental commitment, privacy, pretrial detention and unreasonable searches and seizures.[32] While parental rights may be of like importance, there is an additional consideration involved. The parents' constitutional right to the care and custody of their children must be balanced against the rights of their children to an adequate home and education. As this court stated in *D.M. v. State,* 515 P.2d 1234 (Alaska 1973), a proceeding to terminate a mother's parental rights by reason of abandonment:

> We acknowledge that parental rights are of serious and substantial import. We note, however, that in recent years the courts have become increasingly aware of the rights of children. (footnote omitted) 515 P.2d at 1237.

Even though we are not concerned with a termination of parental rights, we believe that all reasonable alternatives should be explored prior to removal of children from the parental home. Our review of the record indicates that this was done in this case, and that Judge Stewart thoughtfully provided for an alternative, balancing the rights of the children with those of the parents.

In the dispositive phase, the judge was not limited to the allegations of the petitions and was free to consider other evidence in making his determination. Children's Rule 17(b) permits the court to consider social agency and police reports in the dispositive phase.[33]

A Department of Health and Social Services' report dated March 13, 1975 indicated difficulties with the D. family's parental care dating back to October 1971. The children were placed in foster care on two prior occasions, and have been in the custody of the court on four prior occasions. The report indicates the following efforts of social workers to assist the parents: visits by a public health nurse, having the father visit the Alcohol Rehabilitation Center and enter into a program to combat his drinking problems, assistance in securing employment, and arranging for the children to live with their grandparents on occasion. The report fur-

**32.** *Aptheker v. Secretary of State,* 378 U.S. 500, 513–14, 84 S.Ct. 1659, 1667–68, 12 L.Ed.2d 992, 1001–02 (1964) (right to travel); *Covington v. Harris,* 136 U.S.App. D.C. 35, 419 F.2d 617, 623–25 (1969) (mental commitment); *Wyatt v. Stickney,* 344 F. Supp 373, 384 and 344 F.Supp. 387, 396–97 (M.D.Ala.1972) (mental commitment); *Brenneman v. Madigan,* 343 F.Supp. 128, 138 (N.D.Cal.1972) (pretrial detention); *Hamilton v. Love,* 328 F.Supp. 1182, 1192 (E.D. Ark.1971) (pretrial detention); *City of Carmel-by-the-Sea v. Young,* 2 Cal.3d 259, 85 Cal.Rptr. 1, 466 P.2d 225, 232 (1970) (personal privacy); *Parrish v. Civil Service Commission,* 66 Cal.2d 260, 57 Cal.Rptr. 623, 425 P.2d 223, 230–31 (1967) (freedom from unreasonable searches and seizures); *Fort v. Civil Service Commission,* 61 Cal.2d 331, 38 Cal.Rptr. 625, 392 P.2d 385, 389 (1964) (freedom of speech and association).

**33.** In response to the dissent in this opinion, we emphasize that the range of evidence

which the court may consider at the dispositive phase is much broader than that at the adjudicative phase. The court properly considered extensive additional evidence, discussed in the remainder of this opinion, which included prior court custody of the D. children because of parental neglect; a history of parental drinking problems; past attempts by social service agencies to work with the parents in combatting alcoholism and securing employment; and increasing problems evidenced by the children as a result of their parents' drinking and their insecure home environment.

Based on this additional evidence, the children's court could well have concluded that the best interest of the children dictated their temporary removal to a secure and not unfamiliar environment where they could be together and attend their own school regularly, and see their parents frequently while extensive efforts toward rehabilitation of the parents were attempted.

ther indicated that when a child is placed in a foster home, a service plan is determined which includes regular interviews with the parents for the purpose of discussing visits with the children; counseling on various aspects of family life, budgeting, employment, nutrition, educational opportunities, health care, and transportation; supervision and coordination of visits of parents, children and other family members and later setting up a plan for the return of the children and communicating to parents how they can demonstrate the ability to care for the children. The report also indicates that such supportive aids were given the parents in the past, and it is apparent that the court carefully considered other alternatives, seeking recommendations from counsel for the parents and the children before making his decision.

Additional evidence from that considered at the adjudicative phase supports the court's decision. Because of the home situation, one of the children had run away and another was involved in a minor shoplifting incident. The father, upon being advised of this latter incident, abdicated his responsibility for supervising the child and left it to the police to handle alone. A third child was hoarding food, a symptom of insecurity.

The court placed the children in a group home near their residence where they could continue to attend their school. The children were not separated, and provision was made for visits by and with the parents. At the end of the school year, June 1, 1976, the children are to be returned to the parents unless the Division of Family and Children Services, prior to that date, schedules a hearing and petitions the court for further custody out of the parental home for similar reasons to those resulting in the original adjudication of dependency. A program was established for the Division of Family and Children Services to work with the parents in four problem areas of excessive drink, inability to hold continuous employment, health

and over-all ability of the parents to discipline themselves and provide a stable home. The Division was further required to prepare and proceed with written plans pertaining to both the children and the parents.

■ We find that the trial court very carefully considered the alternatives available in arriving at a disposition, and that the disposition involves a reasonable and effective choice from among such alternatives after it became necessary for the best interests of the children to remove them from the family home. The decision does not constitute a severance of familial ties, but the establishment of a thoughtful program for rehabilitation of the family unit. From the record presented to us, it appears that the court and the Division of Family and Children Services are to be commended for their efforts in making a solution to a most difficult problem. Hopefully, it will result in rehabilitation of the parents so as to establish a happier and healthier familial unit within which the goals of suitable child care and guidance will be fulfilled.

AFFIRMED.

RABINOWITZ, J., not participating.

DIMOND, Justice Pro Tem (dissenting).

I fear the court's decision upholding the order of the superior court amounts to an invitation to the state to intrude upon the sanctuary of the home more freely than otherwise might be the case—to interfere with and disrupt the very private relationship between parents and children. All the state need show is that a child is "dependent", and that will be established by producing facts indicating that the children lack "proper" parental care by reason of the parents' "faults, habits or neglect". AS 47.10.010(a)(5); AS 47.-10.290(3). With the approach taken by the majority, the state may now consider itself able to do that without a great deal of difficulty.

The problem is that the majority does not attempt to concern itself with objective standards against which proper parental care and faults, habits or neglect may be measured. The very vagueness of those terms invited the social worker to utilize his own subjective view as to whether an invasion of the home and an attempt to remove the children from their parents was justified.

This interference by the state with basic, fundamental rights is potentially all-encompassing. There are any number of views on the subject of whether parental care is proper. What may be proper to one person may be highly improper to another—there are no objective criteria. Almost any parent may be considered as not giving his child the proper parental care, depending on the ultimately personal determination of what the statute envisages.

Of course, the lack of proper parental care must be caused by the faults, habits or neglect of the parents. But that is not very helpful. Any adult person, if he is honest, would admit to having many faults, some of which may result, in varying degrees, in lack of proper parental care of his children. Precisely the same thing can be said of habits, and I assume the legislature was referring to bad habits, which are extremely difficult to change.[1]

That leaves neglect which results in lack of proper parental care. Here, too, a vast number of parents are affected. The poor may neglect their children by not providing for their physical needs, such as adequate medical attention, clothing, food and shelter and other things. The rich may neglect their children by failing to minister to their psychological and moral needs, such as loving care, security and fulfillment in the personal relationships of love, trust and fidelity, and a good parental example of how an adult should behave.

The latter kind of neglect may be infinitely more harmful than the former. But I would be very much surprised if that type of neglect would often be the subject of the scrutiny of the state and the basis of an effort to separate children from their parents. It is the poor, the so-called "under-privileged",[2] such as we have in this case, upon whom the state would probably focus most of its attention.

I point out the extremely vague and imprecise nature of the statute in order to show my deep concern as to how it may be used by good-intentioned people to deprive parents of their fundamental natural right to nurture and direct the destiny of their children.[3] It is important to notice that my argument supposes no evil intentions on the part of the state. Its agents are sincere and exercise their duties as they see them with subjective good intentions concerning what they consider the best interests of the children. But with no objective standards to guide them, my position is that good people (not bad ones), consistently acting upon the position they adopt, could act as cruelly and unjustly as the greatest tyrants. A tyranny sincerely exercised for the *good* of its victims may be the most oppressive of all tyrannies, because those who act do so with the approval of their consciences.

---

1. Lord Henry Wotton, in the cynical words of his creator, Oscar Wilde, said:

 But then one regrets the loss of one's worst habits. Perhaps one regrets them the most. They are such an essential part of one's personality.

 Oscar Wilde, *The Picture of Dorian Gray*, Dell Pub. Co., Laurel Edition, 1967, at 212.

2. The word "under-privileged", as used as a synonym for poor, is inappropriate. A privilege is a special advantage which one person or class has over another. It is an inequality before the law. An under-privileged person must mean a person who has not enough privilege—a person, that is, who has not enough advantage over his neighbor. To use the word, then, is to complain that there is not enough inequality.

3. See my concurring opinion in *Turner v. Pannick*, 540 P.2d 1051, 1055–56 (Alaska 1975).

This case demonstrates the fears I have expressed as to the lack of objective standards in the statute. Acting at the instance of the social worker, whose position was supported quite strongly by the guardian ad litem for the children, the superior court found the children dependent because of lack of proper parental care. The faults, habits or neglect of the parents, upon which the ultimate adjudication was made, was that some of the children missed school for four or five days because their parents were under the influence of alcohol.

The disposition made was that all of the children be removed from the custody of their parents and placed in the Alaska Youth Village for a period of 14 months. At the end of that time they will be returned to their parents,[4] unless the Division of Family and Children Services demonstrates that the parents have not overcome their drinking problems, have not shown their ability to provide a stable home, and have not been able to hold or have not sought continuous employment, or "for such other reasons as would allow the court to adjudicate the minors as dependent if still with their parents". Visitation was permitted, but only if the parents were sober and not ill.[5]

But that was not all that was provided. The father of the children was ordered to do the following:

At any time that the father of the children is not employed, he shall within three working days report to the Division of Family and Children Services and request their assistance in obtaining employment. He shall thereafter at intervals of not less than every two weeks further report to the Division of Family and Children Services regarding his efforts in the interim period at ob-

taining a job and further request their assistance.

There was no express sanction provided if the father failed to conform. But the penalty for nonconformance was, by inference, abundantly clear—the further loss of his children.

Finally, the order provides:

The Division of Family and Children Services shall prepare and proceed with a written plan of care and development of the children including their schooling, their visits with their parents, their medical needs and their psychological needs. The Division shall also formulate a written plan regarding the rehabilitation of the parents, including their inability to hold continuous employment, any medical problems and their visitation and development of responsibility towards the children.

I have no problem in agreeing with the majority that the evidence supports the trial judge's finding that the children missed four or five days of school because of the intoxication of their parents. But I cannot agree that such a finding makes the children dependent within the meaning of the statute, or that it calls for such a severe order of disposition.

As a matter of common justice, I do not see how the order can be supported. Notably lacking is any evidence that there was child abuse or that the children were deprived of the necessities of life such as food, clothing and shelter, and perhaps more important, the love of their parents. Notably lacking is any reference in the order to evidence produced at the hearing: (a) that other children were absent from school for longer periods of time, and (b) that the two older children, at a conference with the judge in chambers, indi-

---

4. However, as the majority points out, the children would remain in the legal custody of the state for another year.

5. The mother of the children testified that she had stomach and heart troubles—that she was ill. Under the literal wording of the order of disposition, this means that she would not be permitted to see her children, even if she were sober.

cated that they wanted to be at home with their parents.

The basic problem in this case, as I see it, is the fact that neither of the parents are able to ingest alcohol without harmful effects. From the evidence presented, each may well be classified as an alcoholic which, by legislative definition, is

> [A] person who habitually lacks self-control in using alcoholic beverages, or uses alcoholic beverages to the extent that his health is substantially impaired or endangered, or his social or economic function is substantially disrupted.[6]

Alcoholism is not a crime,[7] but rather is classified as an illness or disease,[8] and therefore punishment cannot be lawfully imposed upon one because he is an alcoholic or because he is even simply intoxicated. The state, of course, would agree, and deny that any punishment was involved in this case. It is not punishing, but only healing and rehabilitating.

But we should not be deceived by a name. For the parents to be deprived of the custody of their children and the children deprived of the love and nurturing of their parents, without the consent of either; to place restrictions on the parents' visitation of their children; to require the father to report regularly to the social workers on his success or lack of it in obtaining continuous employment at the risk of further losing custody of his children;

and to force the parents to submit to a plan of rehabilitation formulated by the Division of Family and Children Services as a condition of keeping the family together, if and when the children are eventually returned to their parents—who really cares whether this is called punishment or not. That it includes the elements of punishment—loss of fundamental rights, shame, exile,[9] insults to the inherent dignity and integrity of the parents as human beings—is obvious. Only grave parental misdeeds could justify such a rupture in the parent-child relationship, and misdeeds of sufficient gravity are totally absent here.[10]

I say this in spite of the fact that the majority, in supporting the disposition order, did not rely solely on the trial judge's adjudicative findings based on the petition in this case. The majority looked back at the intervention by the Division of Family and Children Services in the lives of the parents and children since 1971, which apparently was justified by the immoderate drinking of alcohol by the parents during that period. I can find nothing in these past circumstances which was so extreme, so far as the best interests of the children are concerned, as to justify the sweeping order of disposition in this case.

Where disposition is being considered, the majority justifies the consideration by

---

6. AS 47.37.270(1).

7. In 1972 the Alaska Legislature adopted the Uniform Alcoholism and Intoxication Treatment Act. The Declaration of Policy in the Act provides:
 > It is the policy of the state that alcoholics and intoxicated persons should not be criminally prosecuted for their consumption of alcoholic beverages and that they should be afforded a continuum of treatment so they may lead normal lives as productive members of society. AS 47.37.010.

8. *Peter v. State*, 531 P.2d 1263, 1266 (Alaska 1975).

9. In separating parents from their children, there is a form of exile for both.

10. As I have stated, the basic problem is the probability that the parents suffered from the illness or disease of alcoholism. If that is so, the Division of Family and Children Services should refer the problem to professionals in the field of alcohol abuse. There now exists in this community, by reason of the enactment of the Uniform Alcoholism and Intoxication Treatment Act in 1972, treatment programs for alcoholics under the direction of persons highly qualified in that field. I see no reason why such treatment cannot be carried on with parents and children living together as they have the natural right to do. In fact, it seems to me far more likely that such treatment will be successful if the parents do not have to cope at the same time with the agony and anger resulting from being deprived of the custody of their children.

a court of facts not alleged in the petition on the analogy of sentencing in a criminal case, where the court looks to facts in the past record of a convicted defendant which were not admissible at his trial. I mention this to emphasize the point I am making—that a children's dependency proceeding in no way has any of the characteristics of a criminal action, and because of that, punishment or penalties should not be inflicted as I believe they were here.

This case represents to me a massive encroachment upon and denial of some of the inalienable rights of human beings. The state, with all of its vast power, has assumed the role of "big brother" or "super-parent" in regulating the lives of the parents and children who are the victims in this case. I believe it is important to state again what I said not long ago in *Turner v. Pannick*: [11]

> I believe the basic concept that governs this case is the fundamental natural right of parents to nurture and direct the destiny of their children. This is a truth which one discovers by reason, and has the status of knowledge rather than mere opinion. Nature has instilled in man a love for his children; an intimate bond, by nature, exists between parent and child. It would be repugnant to the natural law to deprive a parent of the right to rear his children, except for the most grave reasons. The family is one of the oldest institutions known to mankind and forms the basic unit of our society. The family should enjoy considerable autonomy and independence from state interference.

> If the rule were otherwise, we would be taking a step toward a totalitarian government. Children could be removed from their parents' custody at the will of the state, depending upon what some governmental petty tyrant decides is meant by the term "welfare" or "best interests" of the children. Such a state of affairs would be entirely contrary to the form of government envisioned by the founding fathers of our nation.[12]

I dissent from the majority opinion of this court. The majority states that removal of the children from the family home is justified only under "extreme conditions". I cannot in any way agree that the conditions are so extreme as to justify the action taken in this case.

I would reverse the orders of adjudication and disposition of the superior court, dismiss the petition, and return the children to their parents, with some agreeable provision being made to have persons trained in the field of alcoholism assist the parents in overcoming their excessive drinking.

11. 540 P.2d 1051 (Alaska 1975).

12. 540 P.2d at 1055–56.